**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JERONNA HOPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 6359 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| THE BOARD OF EDUCATION OF | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeronna Hopkins is a teacher at Portage Park Elementary School, employed by the Defendant, The Board of Education of the City of Chicago ("Board"). Hopkins, an African American, alleges that the Board has harassed her and discriminated against her because of her race. Further, Hopkins alleges that the Board has retaliated against her for filing complaints of racial discrimination with both the Board's Equal Opportunity Compliance Office ("EOCO") and the federal Equal Employment Opportunity Commission ("EEOC"). After discovery, the Board moves for summary judgment on both counts. Because Hopkins has failed to adduce evidence sufficient to support a jury verdict in her favor, the Board's motion is granted.

## BACKGROUND[1]

Jeronna Hopkins has been employed as a teacher at Portage Park Elementary School since 2000. In December 2006, at a work-sponsored party at Bernie's Pub, Hopkins had a verbal

---

[1] Summary judgment is appropriate if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. In employment discrimination cases, just as with any civil cases, the Court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532–33 (7th Cir. 2013). Therefore, on this motion, facts are drawn from the Plaintiff's Response to the Defendant's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts ("Pl.'s Resp. to DSOF"), Dkt. 94, and Plaintiff's Local Rule 56.1(b) Statement of Additional Material Facts ("Pl.'s SOAF"), Dkt. 107.

altercation with another teacher, Edwina Klein. Hopkins alleges that Klein made racist comments directed at Hopkins. Hopkins reported the incident to Mark Berman, the school principal. Berman apparently tried to referee the dispute, but did not formally reprimand Klein at the time and did not discipline her in any way until after the Board's Law Department had recommended that Klein be disciplined.

On January 30, 2007, the Board's Area Instruction Officer ("AIO"), Janice Rosales, performed a regularly scheduled walk-through at Portage Park Elementary School. That morning, Principal Berman arranged for a meeting so that teachers could meet the AIO. Believing the meeting to be optional,[2] Hopkins chose not to attend this meeting. During the walk-through that day, Rosales observed several teachers, including Hopkins, in their respective classrooms. Rosales observed that the state of Hopkins' classroom indicated that she was not complying with several of the Board's recommended teaching methodologies, and spoke with Berman afterwards about the classroom deficiencies.[3]

Two days later, on February 1, 2007, Berman gave Hopkins a cautionary notice, citing Rosales' observations and further alleging that Hopkins had failed to submit lesson plans, failed to follow the school-wide math program, failed to attend staff meetings, and failed to display

---

[2] The parties dispute whether Hopkins' belief was reasonable, but that dispute is not material and because this is the Board's Motion for Summary Judgment, the Court takes Hopkins at her word that she reasonably believed the meeting to be optional.

[3] Hopkins disputes the contents of this conversation, but presents no evidence to refute Rosales' and Berman's testimony. Parties may rely on even self-serving evidence to create a genuine dispute of fact, but they must nonetheless present *some* evidence in order to introduce a genuine dispute. *See Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (requiring more than mere "speculation or conjecture" to challenge opposing party's evidence on a motion for summary judgment); *Hill v. Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013) (allowing the use of "self-serving" evidence on a motion for summary judgment, but requiring "personal knowledge" in order to give such self-interested testimony any effect).

current student work in her classroom. Hopkins reacted with anger at the notice,[4] which she contends was an act of retaliation for reporting the Bernie's Pub incident.

Later that month, Hopkins filed a formal complaint (the "2007 Charge") both with the federal Equal Employment Opportunity Commission ("EEOC") and with the Board's Equal Opportunity Compliance Office ("EOCO")—against both Klein (for allegedly making racist comments at Bernie's Pub) and Berman (for allegedly failing to discipline Klein). After an investigation, the EOCO found that Berman had acted improperly in his handling of the incident and the complaint, and recommended that Berman be disciplined. Despite this recommendation, the Board's Law Department ultimately decided not to discipline Berman.

Hopkins alleges that after her EOCO complaint resulted in the EOCO recommending discipline against Berman, Berman engaged in a "campaign of retaliatory harassment." Pl.'s Resp., Dkt. 55, at 13. Specifically, Hopkins alleges that Berman denied Hopkins' multiple requests to change grade levels, denied her request for a position supervising the after-school chess program, and would not appoint her to the non-paid role of instructional team leader for the third-grade teachers. Berman also lowered Hopkins' performance rating in 2009, from "superior" to "excellent,"[5] an action that Hopkins contends was retaliatory rather than related to her performance. Hopkins also alleges that Berman made Hopkins appear to be a worse teacher than she was by openly badmouthing her to parents and other teachers. Hopkins also alleges that

---

[4] The Board has presented evidence that Hopkins tore up the notice and yelled at Berman in front of other front office staff. *See* Def.'s Statement of Uncontested Facts ("Def.'s SOF"), Dkt. 50, ¶ 13. Although Hopkins disputes the specifics of the Board's account, Hopkins admits that she reacted angrily to the notice and that she received formal discipline (a written reprimand) for her response. *See* Pl.'s Resp., Dkt. 55, at 11.

[5] Principals rate teachers with four possible ratings, from lowest to highest: "unsatisfactory," "satisfactory," "excellent," and "superior."

her students were disadvantaged unfairly in a school-wide "new reader" contest to prevent one of her students from winning.

Hopkins filed another EEOC charge in August 2009 (the "2009 Charge"). In that charge, she claimed that in retaliation for the filing of the 2007 Charge, the Board had subjected her to "different terms and conditions of employment," to include lowering her performance evaluation in 2009. Hopkins also listed the "Latest" date of retaliation in March 2009 but—unlike in 2007—did not check the "Continuing Action" box.

Ultimately, Hopkins settled both of her EEOC charges with the Board in March 2010. The settlement agreement "resolves charge numbers: 440-2007-04488 and 440-2009-06390," and provides, in relevant part, that the claimant "agrees not to institute a lawsuit with respect to the above referenced charge" in exchange for Berman changing her 2008 evaluation from "excellent" to "superior." Def.'s Statement of Uncontested Facts ("Def.'s SOF"), Dkt. 50, at ¶ 66; Pl.'s Resp. to DSOF, Dkt. 94, at ¶ 66.

In addition to the alleged campaign of harassment by Berman, Hopkins also alleges that a wide-reaching campaign of harassment by parents of her students created a hostile work environment. It is undisputed that parents submitted complaints—in person, through telephone calls, and through written letters—about Hopkins' style of classroom discipline and treatment of her students. Over several years, the parents of at least 24 different children sent in letters requesting that their children be removed from Hopkins' class.[6] Most of these requests were

---

[6] The parties dispute the admissibility of these letters. While the parent letters are not admissible evidence for the truth of the accusations of verbal and physical abuse, *see* Fed. R. Evid. 802, the truth of the underlying complaints is not a material issue for the purposes of summary judgment. The Board presents the letters to prove something else—that Berman's actions were motivated by his receipt of serious complaints about Hopkins. *See* Fed. R. Evid. 801(c)(2) (defining hearsay only as a statement offered "to prove the truth of the matter asserted *in the statement*").

accommodated, and Hopkins' class size would shrink throughout the school year until she ended each school year with a smaller class size than other teachers in her grade.

In one particular instance, in September 2010, the grandmother of one of Hopkins' students accused Hopkins of intentionally pulling a chair out from under her grandchild, causing the child to fall to the floor and suffer bruises from the impact. Upon learning of this incident, Berman started the process for a formal investigation involving the Department of Children and Family Services ("DCFS") and the Board's Law Department, which initially found that Hopkins had engaged in improper corporal punishment warranting a five-day suspension. Hopkins appealed, and on appeal the Board determined that while Hopkins did not deliberately use force against the student, Hopkins had still acted improperly by engaging in verbally abusive conduct towards her students. The suspension was reduced to two days without pay, and Hopkins served this suspension in September 2011.

In another episode during the same school year, a dispute arose between Hopkins and the mother of one of her students, so Hopkins requested that the student be transferred out of her classroom. Berman declined the request, and the relationship between Hopkins and the student's mother deteriorated further. In June 2011, during the last week of the school year, Berman changed his mind and transferred the student out of Hopkins' class. When Berman and the student's mother arrived in Hopkins' classroom to retrieve the student's belongings, Hopkins and the mother engaged in an in-classroom altercation severe enough to warrant the intervention of the school's security guard. Hopkins alleges that during the altercation, Berman stood by while the irate parent threw cookies at Hopkins.

After Berman retired in 2012, Maureen Ready replaced him as principal at Portage Park Elementary. Ready has also received several parental complaints about Hopkins, and reprimanded Hopkins twice for improper disciplinary techniques.

## DISCUSSION

### I.     The Relevant Time Period

Before turning to the merits of the parties' arguments, the Court must first decide the threshold issue of which facts may be considered for the purposes of this motion. The Amended Complaint alleges two counts—racial discrimination and retaliation—each in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"). To the extent that the Amended Complaint alleges harassment as part of a hostile work environment, that claim would also be governed by Title VII and § 1981. Although the substantive analyses for both Title VII and § 1981 involve substantial "overlap," *CBOCS West, Inc., v. Humphries*, 553 U.S. 442, 454–55 (2008), each cause of action has its own limitations period.

#### A.     Limitations on Title VII Claims

A person bringing a civil action under Title VII must first file an EEOC charge and receive a right-to-sue letter from the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1)(A). When originally filed with the Illinois Department of Human Rights ("IDHR"), an EEOC charge must be filed within 300 days of the allegedly unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). The Board contends that because this case arises from an EEOC charge filed with the IDHR on March 7, 2011, any events occurring earlier than 300 days before the EEOC charge (May 11, 2010) are not actionable. Hopkins responds by arguing that earlier events are part of a single "continuing violation" extending into the statutory time period and are therefore relevant. Hopkins characterizes Berman's actions as part of a single "continuing violation" of discriminatory and retaliatory conduct creating a hostile work environment, starting from the

immediate aftermath of the 2006 holiday party incident and extending until Berman's retirement in 2012.

The proper scope of a judicial proceeding following an EEOC charge "is limited by the nature of the charges filed with the EEOC." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). Specifically, a plaintiff may only bring claims that are originally included in the EEOC charge or are "reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256–57 (7th Cir. 2011) (internal quotations omitted). In addition, evidence of a "continuing violation" may be considered as part of a hostile work environment claim, because a hostile environment is one single wrong. *See Pruitt v. Chicago*, 472 F.3d 925, 927 (7th Cir. 2006) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–15 (2002)). In the EEOC charge giving rise to this case, Hopkins alleged race discrimination and retaliation for her EEOC charges filed in 2007 and 2009, describing "harassment and discipline" as a "Continuing Action" with no "Earliest" date. Pl.'s App., Ex. T, Dkt. 84.[7] However, discrete employment actions before the statutory 300-day period are not actionable, even if those discrete acts are "mixed with a hostile environment." *Pruitt*, 472 F.3d at 927. As a result, a judicial proceeding following an EEOC charge alleging continuing discrimination (other than a hostile work environment) or retaliation may look outside the statutory 300-day period—in this case, from May 11, 2010 to May 7, 2011—only for instances of a "continuing violation" or for "background evidence" relevant to violations within the statutory period. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 112–13.

---

[7] The docket entry for Plaintiff's Exhibit T is mislabeled "Exhibit U," but the document itself is labeled "Exhibit T" and matches the description for Exhibit T in the Plaintiff's Index. *See* Pl.'s App., Dkt. 56, at 2.

The Board also argues that events occurring *after* Hopkins filed the EEOC charge are not actionable because Hopkins failed to exhaust the available administrative remedies. This argument is inapplicable for similar reasons. Hopkins does not seek to refer to later events as independently actionable violations, but rather refers to them as part of the same "campaign" of retaliatory harassment. Pl.'s Resp., Dkt. 55, at 13. Just as the events before the 300-day statutory period may constitute the same continuing violation, later actions—up until the filing of this case—may similarly contribute to a "single wrong" that continues after the filing of the EEOC charge.[8]

### B.    Limitations on § 1981 Claims

The timeliness inquiry of a § 1981 claim follows a more straightforward analysis. Unlike Title VII claims, § 1981 claims are not limited to allegations first filed in an EEOC charge, and plaintiffs need not obtain an EEOC right-to-sue letter. *See* 42 U.S.C. § 1981. Although the statute itself does not provide a limitations period, *see id.*, the Supreme Court has held that a four-year statute of limitations applies to § 1981 claims that allege employment discrimination. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004).

Hopkins filed this case on September 12, 2011. As a result, the § 1981 statute of limitations allows her to sue for any employment practices made unlawful by that statute within four years of that date—*i.e.*, after September 13, 2007. Just as with Title VII claims, the "continuing violation" doctrine allows a court analyzing a § 1981 claim to consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir. 2004). Therefore, the

---

[8] In any event, the Board raised this "failure to exhaust administrative remedies" argument for the first time in its Reply brief, and it needs not be considered. Arguments not raised in an opening brief are deemed forfeited. *See United States v. Boyle*, 484 F.3d 943, 946 (7th Cir. 2007).

§ 1981 statute of limitations bars Hopkins' recovery for discrete acts before September 13, 2007, and allows the consideration of earlier acts only as part of a continuing violation.

### C.    Settlement Agreement

The Board separately contends that claims relating to events prior to August 20, 2009 (when Hopkins filed her second EEOC complaint), are not actionable because the parties settled the charges Hopkins filed on her 2007 and 2009 complaints. Hopkins counters that the settlement agreement does not cover a hostile work environment that continued through 2012—even if the hostile environment started before the agreement was executed.

The "continuing violation" doctrine does not apply here, however. The purpose of the doctrine is to interpret statutes of limitations in the context of unlawful employment practices that "cannot be said to occur on any particular day," where claims are "based on a cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). A settlement agreement, on the other hand, typically resolves claims arising from all conduct predating the agreement, and that is the case with respect to the agreement Hopkins and the Board entered into in March 2010. Hopkins settled her claims as to both liability and relief for all allegedly discriminatory or retaliatory actions that were included in her 2007 and 2009 EEOC charges and agreed "not to institute a lawsuit with respect to" those charges. *See* Def.'s SOF ¶ 66; Pl.'s Resp. to DSOF ¶ 66. That is precisely what Hopkins is seeking to do, however, in arguing that the conduct that predated her 2009 and 2007 charges is part of a "continuing violation": prosecuting a lawsuit with respect to charges that she resolved by way of the settlement agreement. By virtue of the settlement agreement, Hopkins effectively agreed to carve out conduct predating the 2009 EEOC complaint from any future claim she might assert. *Cf. Pruitt,* 472 F.3d at 929–30 (suggesting that it is sensible to limit the temporal scope of a hostile work environment claim by carving out conduct to which the claimant had forfeited a right to

proceed—there, by *laches*). Hopkins makes no claim that the settlement agreement was, or is, invalid; she must, therefore, be able to show that the events after the second settled EEOC charge, dated August 20, 2009, are independently sufficient to support any hostile work environment claim. That claim cannot rely on the events that were the subject of her 2007 and 2009 EEOC complaints.

Therefore, this Court will consider events prior to August 20, 2009 only as background information and only to the extent necessary to understand Hopkins' claims. For Hopkins' Title VII claims, the Court will consider events after August 20, 2009, until the filing of this case on September 12, 2011, as they relate to her allegations of a hostile work environment, but will otherwise only consider employment practices that occurred within the 300-day statutory period from May 11, 2010 to March 7, 2011. For Hopkins' § 1981 claims, the Court will consider facts occurring from August 20, 2009, until the filing of this case on September 12, 2011.

## II.      **Hostile Work Environment**

In the Amended Complaint, Hopkins alleges that that the harassment she experienced constituted a hostile work environment. Am. Compl., Dkt. 9, at ¶ 17–20, ¶ 27–29. The Seventh Circuit has held that to avoid summary judgment on a hostile work environment claim, "a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) her race or protected activity must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). In her briefs, Hopkins alleges two main sources of harassment: parents of her students and Principal Berman.

Hopkins' complaints of parental harassment fail most obviously on the "basis for employer liability" element. *Chaib*, 744 F.3d at 985. The Board has no ability—much less duty—to control parents expressing concern about their children's education. Conduct from non-employees is not enough to support a hostile work environment claim, unless the employer exhibits deliberate indifference to actually hostile behavior. *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731–32 (7th Cir. 2009) (finding no hostile work environment as a matter of law, even where teacher was subjected to racial slurs by students in isolated incidents).

Hopkins has not adduced evidence of either actionable hostility by parents or deliberate indifference by the Board. The letters and complaints lodged against Hopkins by parents did not constitute harassment and did not create a hostile work environment for Hopkins. The letters entered into the record show concerned parents seeking a suitable educational environment for their children, not hostility directed at Hopkins personally. The complaints were neither severe nor pervasive enough to interfere with Hopkins' performance of her job duties, as complaints directed to the school's administration do not create a workplace "permeated with discriminatory ridicule, intimidation, and insult." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). Even the most serious parent incident, the cookie-throwing altercation broken up by the school security guard, was a single isolated incident. The student was being removed from Hopkins' classroom permanently, and there is no evidence that Hopkins ever encountered that student's parent again.

Further, there is no evidence at all that the complaints about Hopkins were animated by racial bias or by retaliatory intent. There is no mention of race in these letters, and Hopkins advances no theory about how *parents* would be motivated to retaliate against her prior EEOC complaints against the principal. Because the alleged harassment was too mild and indirect to be

offensive, has no link to racial discrimination or retaliation, was not severe or pervasive, and did not come from persons under the employer's control, Hopkins' parental harassment allegations fall far short of what is required to avoid summary judgment.

Neither has Hopkins shown any response by the Board justifying liability, even if the parental complaints could be deemed to have created a hostile work environment. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013) (explaining that employers are liable for racially hostile environments when they fail to take remedial action). To the contrary, the undisputed evidence establishes that students of complaining parents were regularly removed from Hopkins' classroom, an action that eliminated the possibility that the same parents would continue to harass Hopkins (again, indulging only for the sake of argument her contention that the parental complaints created a hostile work environment), and arguably *improved* Hopkins working conditions by reducing the size of her classes.

The hostile work environment claim as it relates to Berman's actions fails as well. Those actions did not remotely suffice to create the kind of offensive and oppressive working conditions necessary to support a hostile work environment claim. Berman's assignment of Hopkins to the third grade, denial of Hopkins' request to supervise the after-school chess club, and decision not to appoint her to the position of instructional team leader are routine administrative actions did not result in working conditions that were even objectively worse— much less objectively offensive or severe. Even Berman's allegedly mean-spirited criticisms of Hopkins' teaching style, directed to other teachers, administrators, and parents, do not rise to the point of being "physically threatening or humiliating." *Luckie*, 389 F.3d at 714. These actions do not begin to approach the type of conduct necessary to create a hostile work environment. *Cf. Nichols v. Mich. City Plant Planning Dep't.*, 755 F.3d 594, 601 (7th Cir. 2014) (holding that

while calling a black coworker a "black n----r" was "deplorable" with "no place in the workforce," one instance—even when accompanied by other harassing incidents within the same two-week period—was not sufficiently severe or pervasive to support a hostile environment claim).

In addition, although Hopkins has certainly presented evidence that personal and professional animosity existed between Berman and her, she has utterly failed to tie that animosity to Hopkins' race. *See Gosey v. Aurora Med. Ctr.*, 749 F.3d 603, 605 (7th Cir. 2014) (requiring that harassment be "based on [the employee's] race" to avoid summary judgment for an employer); *Luckie*, 389 F.3d. at 713–14 (requiring that the allegedly hostile conduct have a "racial character or purpose" in order to support a hostile work environment claim). She has adduced no evidence at all that Berman's actions were racially motivated. Although Hopkins has alleged unprofessional conduct, no reasonable jury could conclude that Berman's behavior was offensive, that it was motivated by racial discrimination, or that it was severe and pervasive enough to create a hostile work environment.

## III. Hopkins' Prima Facie Case Under the Indirect Method of Proof

Plaintiffs bringing a discrimination claim or retaliation claim under Title VII or § 1981 may proceed under a direct method of proof or an indirect method of proof. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–02 (1973); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007) (noting that methods of proof for Title VII and § 1981 are essentially identical), *aff'd*, 553 U.S. 442 (2008). Hopkins opts to take the indirect approach, where the plaintiff employee must first establish a prima facie case, the defendant employer must then rebut that case with a legitimate reason for its actions, and then the plaintiff must prove that the proffered reason is pretextual. *McDonnell Douglas*, 411 U.S. at 801–04. In the context of a racial discrimination claim, the prima facie case requires the plaintiff to show that (1) she is a

member of a protected class; (2) her performance met the employer's legitimate expectations; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007). Similarly, a prima facie case for retaliation requires the plaintiff to show that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Amrhein v. Health Care Servs. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). The Board concedes element (1) in both claims—that Hopkins is African American, a protected racial class, and that she engaged in statutorily protected activity—but challenges the other elements. Elements (2) and (3) are essentially identical between the racial discrimination claim and the retaliation claim.[9] Element (4) of the two claims differ only slightly in who a "similarly situated" comparator might be—for the racial discrimination claim, the comparators are non–African Americans, and for the retaliation claim, the comparators are those who did not file an EEOC complaint.

When determining whether an employee is meeting an employer's legitimate expectations, courts look to the employee's performance "at the time of the adverse employment action." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). Also, the test for "similarly situated" comparators requires analysis of the plaintiff's conduct at the time of the adverse action. *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009). Accordingly, the Court first determines whether the Board took any action with respect to Hopkins that can be construed as an adverse employment action.

_____

[9] The legal standard for an actionably adverse practice for purposes of a Title VII retaliation claim differs slightly from those of a Title VII discrimination claim or of § 1981 claims, and will be discussed below.

## A.    Adverse Employment Actions

Hopkins alleges that her suspension in 2011 and the hostile work environment she endured constituted adverse employment actions. Plainly, the suspension qualifies, but Hopkins' latter claim fails because (as discussed above) her hostile work environment claim fails. Moreover, even if Hopkins had established a hostile work environment claim, she could not bootstrap that claim into a separate discrimination or retaliation claim because a hostile work environment claim does not require a showing that the employer took an adverse employment action.[10] In asserting that the alleged hostile work environment she endured constituted an adverse employment action, Hopkins appears to be attempting to circumvent the need to identify an adverse action altogether. That effort must be rejected. To support her discrimination claims, Hopkins' claims of harassment must be analyzed under the standards of an "adverse employment action" for each respective statute.

### 1.    Title VII Retaliation

The test for what constitutes an "adverse employment action" differs slightly for retaliation claims under Title VII, so Hopkins' Title VII retaliation claim is analyzed separately from the Title VII discrimination claim and both § 1981 claims.[11] The Supreme Court has analyzed the textual differences between Title VII's anti-discrimination provisions and its anti-retaliation provisions and has concluded that the anti-retaliation provisions cover a broader range

---

[10] The *McDonnell Douglas* method of indirect proof allows a plaintiff to indirectly prove *causation* between the plaintiff's membership in a protected class (or participation in a protected activity) and the challenged employment actions. Even if Hopkins were permitted to sidestep the causation element to her hostile environment claims by applying the *McDonnell Douglas* method of indirect proof, she would still be unable to overcome her deficiencies on objective offensiveness, severity or pervasiveness, or employer liability. *See supra* Part II.

[11] As discussed above, Hopkins' Title VII claims are subject to narrower temporal restrictions than her § 1981 claims. Specifically, discrete employment practices must fall between May 11, 2010 to March 7, 2011, and any hostile environment must have extended into this statutory time period.

of employer conduct. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–62 (2006). Unlike Title VII's anti-discrimination provisions in 42 U.S.C. § 2000e-2, which are limited to employer actions that affect "terms and conditions" of employment, the anti-retaliation provisions in § 2000e-3 protect against "material adversity" that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citing *Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).[12] This Supreme Court analysis of the statutory text of Title VII does not apply to § 1981, because that statute has no analogous text justifying a broader definition of "adverse action" in § 1981 retaliation claims.[13]

Hopkins' litany of complaints about her treatment by Berman fall well short of adverse employment actions that could be deemed sufficient to dissuade employees from asserting complaints about discrimination. Failure to accommodate an employee's personal preference alone is insufficient to show a materially adverse reassignment of duties; a reassignment must result in "objectively less desirable duties" in order to be actionable. *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729 (7th Cir. 2009) (holding that a teacher's involuntary reassignment from twelfth to seventh grade was not materially adverse). Lowered performance ratings, without accompanying tangible job consequences, are not actionably adverse. *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008). Rudeness and ostracism by coworkers and even supervisors do not

[12] Because the Supreme Court agreed with the Seventh Circuit's formulation in *Burlington Northern*, the Seventh Circuit's pre–*Burlington Northern* cases are still good law. *See Stephens v. Erickson*, 569 F.3d 779, 791 n.9 (7th Cir. 2009) ("To the extent that the Court clarified the test for measuring the requisite materiality of an adverse retaliatory act, it adopted the test that we previously applied in *Washington*. Therefore, we consider our decisions under *Washington* and its predecessors to be consistent with *Burlington Northern*.") (internal citations omitted).

[13] Although the Seventh Circuit has previously observed that it "[saw] no reason to apply different requirements between [Title VII and § 1981] with regard to retaliation claims," *Humphries v. CBOCS West, Inc.*, 474 U.S. 387, 404 (7th Cir.2007), *aff'd*, 553 U.S. 442 (2008), the court was speaking only "generally" about whether the elements of the *McDonnell Douglas* framework was appropriate for both statutory causes of action. *See id.* at 403–04.

constitute a materially adverse employment actions. *See Stutler v. Ill. Dept. of Corrections*, 263 F.3d 698, 704 (7th Cir. 2001); *Parkins v. Civil Constr. of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998). Even rummaging through an employee's desk, listening in on an employee's phone calls, refusing to greet or acknowledge an employee, or canceling meetings in bad faith are too "trivial" to be deemed adverse actions sufficient to support a retaliation claim. *Stutler*, 263 F.3d at 704 (collecting examples).

Especially when limited to the statutory 300-day period before Hopkins' EEOC charge, Hopkins' remaining allegations are not actionably adverse under even the broad standard applied to Title VII retaliation claims. Hopkins' own personal disappointment with her assigned grade or her assigned students—whether she wished to keep students who were transferred out or whether she wished to remove students who stayed in—does not stem from an "objectively less desirable" assignment and is therefore not materially adverse. *Lucero*, 566 F.3d at 729. Hopkins' other allegations of Berman's harassment are similarly too trivial to support a Title VII retaliation claim.[14] Badmouthing Hopkins with personal attacks in front of students, parents, and other teachers would certainly be unprofessional conduct, but workplace rudeness without material harm is "too petty and tepid to constitute a material change" in one's employment. *Stutler*, 263 F.3d at 704. The same is true of Hopkins' allegations that an elementary students' reading contest was structured unfairly to the students in her class. Even Hopkins' allegations that Berman harassed her with phone calls cannot constitute adverse employment actions. *Cf.*

---

[14] Elsewhere in her brief, Hopkins cites the lack of adverse employment actions as proof that she was meeting legitimate job expectations, arguing, "Actions speak louder than words: if there was anything to all of these complaints, someone—especially Mr. Berman—should have done something about it. The fact *he did nothing about them* suggests that he thought the complaints were unworthy of investigation and action." Pl.'s Resp., Dkt. 55, at 8 (emphasis added). Hopkins cannot have it both ways, and undermines her own argument by highlighting the absence of any adverse actions other than the suspension.

*Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000) (telephone eavesdropping by supervisor not actionably adverse).

As with the hostile work environment claim, Hopkins fails to tie the alleged parent harassment to any kind of theory of Board liability. Hopkins has not shown that the Board, or Berman, failed to take reasonable steps to stop any parent harassment. *See Knox v. Indiana*, 93 F.3d 1327, 1335 (7th Cir. 1996) (holding that a jury could reasonably find Title VII retaliation liability for an employer "sitting on its hands in the face of [a] campaign of co-worker harassment"). Specifically, Hopkins has alleged no facts that the Board had the power to control parental complaints or that it even had the discretion *not* to investigate those complaints. The closest Hopkins comes to alleging employer acquiescence in actual parental harassment is her allegation that Berman failed to promptly transfer a student whose parents had threatened Hopkins. Specifically, Hopkins' contends that Berman's inaction led to escalating hostility that culminated in the school security guard having to intervene in the cookie-throwing altercation. That altercation, however, occurred during the process of permanently transferring the student *at Hopkins' request*; after the student was transferred, the facts give no reason to believe that parent would have an opportunity to harass Hopkins again. *See Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994–95 (7th Cir. 2011). After ensuring that Hopkins and the angry parent would never interact again, there was nothing left for the Board, or Berman, to do.

Thus, the only employment action that could be categorized as actionably adverse under the Title VII retaliation standard is Hopkins' two-day suspension.

### 2.    Title VII Discrimination and § 1981 Claims

For Hopkins' Title VII discrimination and both § 1981 claims, an actionably adverse employment action requires a material change to the "terms and conditions" of employment. Generally speaking, there are three categories of actionably adverse employment actions:

"(1) termination or reduction in . . . financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). Suspension without pay is a materially adverse employment action. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005); *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999).

This "terms and conditions" standard is a more demanding standard than for of Title VII retaliation claims, so—aside from her suspension—having failed to satisfy the former, Hopkins per force fails to satisfy the latter. *See Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Just as with the Title VII retaliation standard, not everything that makes an employee unhappy is an adverse action. Adverse employment actions do *not* include lateral transfers that conflict with an employee's "purely subjective preference for one position over another." *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002). These subjective preferences are not enough to "justify trundling out the heavy artillery of federal antidiscrimination law." *Id.*; *see also Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (transfers to less interesting work not materially adverse). When a transfer happens in response to a complaint or rumor, the transfer itself does not constitute an adverse action even if the context lends credibility to the rumors or complaints. *O'Neal v. Chicago*, 392 F.3d 909, 912 (7th Cir. 2004). Although a reduction in paid duties with an accompanying reduction in pay could be an adverse employment action, a denial of additional paid duties outside of the employee's ordinary duties is not enough. *See Hill v. Potter*, 625 F.3d

998, 1001, 1003 (7th Cir. 2010) (finding no adverse action in a reduction of hours for an hourly employee when the employee failed to prove that she was "entitled to the hours."). To show an adverse employment action from a denial of additional paid responsibility, the employee must show that the work was actually available. *See id.*

And just as with the Title VII retaliation analysis, the other incidents Hopkins complains of are too trivial to meet the higher "unbearable changes in job conditions" standard of the Title VII discrimination claim or the § 1981 claims. *Barton*, 662 F.3d at 454. Principal Berman transferring children out of Hopkins' class in response to parent complaints—even if the complaints were unfounded—does not change the terms or conditions of Hopkins' employment. *See O'Neal*, 392 F.3d at 912. Even if these transfers did constitute a material change in employment, it could not be said to be "adverse"; as noted, given that Hopkins ended up with smaller class sizes as a result, the transfers arguably *improved* the conditions of her employment. Denying Hopkins the role of supervising the after-school chess club does not qualify, either. Even if the position resulted in extra pay, the limited number of extracurricular positions requires the denial of some requests. In other words, Hopkins was not entitled to have other teachers' requests denied in order to have her own request granted. *Cf. Hill*, 625 F.3d at 1003. Because trivial workplace rudeness and routine administrative matters cannot constitute adverse employment actions, the only adverse action shown in this case is Hopkins' two-day suspension.

Thus, as with the Title VII retaliation claim, Hopkins' unpaid two-day suspension is the only materially adverse action alleged.

### B. Employer's Legitimate Expectations

The parties dispute whether Hopkins met the Board's legitimate expectations. When determining whether an employee is meeting an employer's legitimate expectations, courts look to the employee's performance "at the time of the adverse employment action." *Dear v. Shinseki*,

578 F.3d 605, 610 (7th Cir. 2009). As discussed above, the only adverse employment action suffered by Hopkins was her two-day suspension, so this Court considers Hopkins' job performance during the events leading up to her suspension.

Hopkins does not dispute that in the years leading up to her suspension, the school administration regularly received parental complaints about her use of corporal punishment and other harsh discipline. These parental complaints alleged serious physical and verbal abuse directed at Hopkins' third and fourth grade students. Hopkins disputes the substance of the parent complaints, but does not dispute that the office regularly received parental complaints about Hopkins and does not controvert evidence that complaints about Hopkins outnumbered complaints about other teachers by a "10-1" ratio or that "99 percent" of classroom change requests requested transfers out of Hopkins' class.[15] Def.'s SOF ¶¶ 21, 27. In fact, Hopkins outlines *additional* instances of parents accusing Hopkins of physical and verbal abuse in her own statement of facts. *See* Pl.'s SOAF ¶¶ 46–49 (listing additional parent allegations that Hopkins had physically or verbally abused their children). Further, Hopkins admits that on at least one occasion, Berman saw her "grabbing" a student's arm, but disputes the Board's characterization of the incident. Pl.'s Resp. to DSOF ¶ 38. This was the context at Portage Park in September 2010, when Berman received the complaint that ultimately resulted in Hopkins' suspension.

That September, Berman received a letter accusing Hopkins of intentionally pulling out a chair from underneath one of her students, allegedly as a punishment for spilling soil from a science project. According to the letter, as the result of Hopkins' actions, the child fell to the

---

[15] Hopkins disputes that the witnesses who provided this testimony "literally meant" these exact numbers, Pl.'s Resp. to DSOF ¶ 21, but that response is not sufficient to create a fact dispute. The party opposing summary judgment must present evidence, not "speculation or conjecture." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014).

ground, suffering bruises on her backside. Upon receiving this report, Berman initiated the process for a formal investigation by both DCFS and the Board's Law Department. The investigation determined that Hopkins had used corporal punishment and recommended a five-day suspension. Hopkins then appealed this finding. On appeal, the Board found that Hopkins did not intentionally use physical force against the child, but still found that Hopkins had violated the teacher code of conduct by treating others "discourteously" and using "verbally abusive language to or in front of students." The five-day suspension was reduced to two days, and Hopkins served the suspension at the beginning of the next school year.

In view of the nature and number of the parental complaints, generally, and the nature of the incident that precipitated her suspension specifically, Hopkins cannot establish that she was meeting the Board's legitimate expectations when she was disciplined. Hopkins challenges her suspension and urges this Court to ignore the results of the Board's investigation. However, employers may investigate complaints about their employees and may use those findings to rebut claims of discrimination. *See Biolchini*, 167 F.3d at 1154 (granting summary judgment for an employer whose investigation showed that the employee was not meeting legitimate job expectations). Hopkins argues that parent complaints were not credible, as demonstrated by the fact that Berman did not take action in response. That argument ignores the uncontroverted fact that Berman regularly moved children whose parents complained about Hopkins into other classrooms, resulting in larger class sizes for other teachers and smaller classes for Hopkins. *See* Def.'s SOF ¶ 25; Pl.'s Resp. to DSOF ¶ 25.

In any event, the motivations or accuracy of the investigation-triggering complaints are not material: even when an employer investigation is alleged to be "imprudent, ill-informed, and inaccurate," summary judgment for the employer who finds misconduct is appropriate unless the

employee presents evidence that the employer investigation itself was conducted in a discriminatory manner. *Biolchini*, 167 F.3d at 1154 (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)). Applied to this case, it is irrelevant that the original complaint of physical abuse was not sustained by the investigation. The accuracy or inaccuracy of the original parental complaint does not change the fact that the investigation uncovered other misconduct by Hopkins. Hopkins points to no evidence that the investigation itself was conducted differently because of her race or her prior discrimination complaints, or that misconduct actually found by the investigation did not warrant the two-day suspension.

Hopkins' positive performance evaluations and teaching awards do not change the analysis. Meeting or even exceeding expectations in one job function does not negate deficiencies in other job functions. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (finding that despite showing good performance in production, employee was not meeting legitimate expectations because of altercations with subordinates, peers, and supervisors); *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (holding that employers are "entitled to determine that the deficiencies in [employee] performance outweighed [positive] accomplishments"). This is especially true when the evidence of positive performance evaluation does not purport to be a complete evaluation. *See Fortier*, 161 F.3d at 1114 (holding that a positive supervisor evaluation based on an admittedly limited observation period was insufficient to raise a triable issue on employee performance). Hopkins cites her awards and her performance evaluations in 2004, 2006, 2008, and 2012, but none of that evidence controverts (or is even relevant to) the Board's findings of misconduct in 2010 in connection with the chair-pulling incident. Similarly, Hopkins' teaching awards for student

performance on spelling bees, standardized tests, and school attendance do not negate the Board's findings of unprofessional conduct and verbal abuse.

In light of the undisputed evidence of Hopkins' misconduct, and the absence of any evidence to undermine the legitimacy of the Board's investigation, this Court concludes that no reasonable juror could find that Hopkins was meeting expectations when she was formally disciplined.

### C.    Similarly Situated Employees

The final element in proving a prima facie case of discrimination or retaliation is to show that similarly situated employees, not in the protected class or engaged in protected activity, were treated better by the employer. Hopkins falls short with respect to this element as well. To begin, she appears to have abandoned her claim of racial discrimination argument when providing comparators. In her brief and in her factual statements, Hopkins identifies other teachers who did not engage in protected activity, but does not identify their races.[16] There is therefore, no basis to conclude that non-African-American employees were treated more favorably than Hopkins when they had committed similar misconduct. In the absence of any such evidence, this Court deems Hopkins' racial discrimination claims as forfeited. *See United States v. Boyle*, 484 F.3d 943, 946 (7th Cir. 2007).

In any event, the only adverse action that the Board took against Hopkins was her unpaid suspension, and Hopkins has failed to identify any similarly situated employees. In order to establish that other employees were similarly situated, the other employees must be "engaged in similar conduct without differentiating or mitigating circumstances." *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009) (quoting *Radue v. Kimberly-Clark Corp.* 219 F.3d 612, 617–

---

[16] Indeed, in its Reply, the Board points out that at least one of Hopkins' purported comparators is also African American.

18 (7th Cir. 2000)). Hopkins' discipline came only after a complaint alleging corporal punishment, a formal investigation with Hopkins' participation, an official finding of teacher misconduct, and an appeal. Hopkins does not identify any other investigations that found teacher misconduct. Moreover, Hopkins cannot point to the investigation itself as being motivated by retaliation, because she cannot identify similar complaints about other teachers. Hopkins was the subject of far more parent complaints than any other teacher, so she cannot identify similarly situated teachers who were not investigated.

Similarly, even if Hopkins had alleged facts sufficient for a reasonable jury to find a hostile work environment caused by employer acquiescence in ongoing parent harassment, Hopkins is unable to identify other teachers with such contentious relationships with students' parents. Hopkins has not alleged that school administrators took steps to protect other teachers from parent harassment in ways that they did not afford to Hopkins. Because most of the Board's allegedly retaliatory actions stemmed from parent complaints, Hopkins needed to identify teachers subject to the same quantity or the same type of parent complaints. She has not done so—and based on the unrebutted evidence submitted by the Board that complaints about Hopkins outnumbered complaints about other teachers by a 10 to 1 margin, she cannot do so—and has therefore failed to show that her similarly situated coworkers were treated more favorably.

In summary, Hopkins' prima facie case fails because the only adverse action in the record is her two-day suspension, and she has failed to show that a reasonable jury could find that she was meeting legitimate job expectations at the time of her suspension or that similarly situated employees were treated more favorably.

## IV. The Board's Stated Reasons for Disciplining Hopkins

Even if Hopkins were able to show a prima facie case for retaliation or discrimination, the inquiry would not end there. If the employee presents a prima facie case, the burden shifts to the employer to provide a legitimate reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). The employer bears a "light burden" in rebutting the employee's prima facie case. *Stockwell v. Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). "Once the employer has articulated a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination falls away. The plaintiff then has the burden of producing sufficient evidence to show that reason to be pretextual." *Id.* (internal citation omitted).

The Board has shown that it followed its own procedures for investigating teacher misconduct, and that it found that Hopkins had violated its code of conduct. Hopkins does not dispute that the Board's investigation found misconduct, but rather disputes the accuracy of those findings. Specifically, Hopkins finds fault with the investigation's methodology in asking witnesses irrelevant questions. However, as discussed above, a plaintiff cannot merely point to flaws in an employer's disciplinary investigation to defeat summary judgment. *Biolchini*, 167 F.3d at 1154. Rather, the plaintiff must show that the investigation was conducted in a discriminatory or retaliatory manner. *Id.* Hopkins has not produced any evidence that the investigation was flawed because of the discriminatory or retaliatory motive of the investigators.

For similar reasons, Hopkins is unable to show that a reasonable jury could find that the Board's reasons for disciplining Hopkins are pretextual. To show pretext, a plaintiff must show both that the employer's stated reason was dishonest and that the true reason was motivated by discriminatory intent. *Stockwell*, 597 F.3d at 901. Hopkins fails on both prongs. To prove that the employer's stated reason is dishonest, plaintiffs must show that the employer "did not honestly believe" its own stated reason. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012).

Indeed, if the prima facie case relies on indirect proof, the plaintiff can only show dishonesty if the stated reason has no basis in fact. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008). Hopkins cannot show that the investigation had no factual basis in its findings that she had acted improperly. Further, Hopkins offers no evidence to suggest that the entire investigation was meant to be "a mask to hide unlawful discrimination." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). Because Hopkins is unable to show that the Board's stated reasons are pretextual, summary judgment in the Board's favor is warranted.

*          *          *

For the reasons set forth above, the Board's Motion for Summary Judgment is granted, and judgment is entered for the Defendant.


Dated: November 14, 2014

John J. Tharp
United States District Judge